**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| XTO Energy Inc., and XTO Holdings, LLC, <br><br> Plaintiff, <br><br> v. <br><br> North Dakota Board of University and School Lands, and the United States of America, <br><br> Defendants. | Case No. _____ <br><br><br> **COMPLAINT** |

Plaintiffs XTO Energy Inc. ("XTO Energy") and XTO Holdings, LLC ("XTO Holdings"), by and through their counsel Fredrikson & Byron, P.A., 1133 College Drive, Suite 1000, Bismarck, North Dakota 58501, state and allege for their Complaint against the North Dakota Board of University and School Lands ("North Dakota") and the United States of America ("United States") (collectively "Defendants"), as follows:

## NATURE OF THE CASE

1.      North Dakota and the United States assert competing rights and interests in portions of properties leased to XTO Energy and XTO Holdings. The competing assertion of rights and interests exposes XTO Energy and XTO Holdings to inconsistent claims for royalties by the Defendants and the prospect of double liability. XTO Energy and XTO Holdings thus bring this action for interpleader to determine the respective rights of North Dakota and the United States to royalty payments attributable to the properties in which North Dakota and the United States both claim competing rights and interests.

## PARTIES

2.      XTO Energy is a corporation formed and existing under the laws of the State of Delaware, with its principal place of business located in Spring, Texas.

3.     XTO Holdings is a limited liability company formed and existing under the laws of the State of Delaware, with its principal place of business located in Spring, Texas.

4.     XTO Energy is an oil and gas exploration and production company that leases properties from both North Dakota and the United States in McKenzie and Williams Counties, North Dakota, to explore for and produce oil and gas. Prior to the filing of this Complaint but after certain of the events described herein, XTO Energy assigned ownership of all the oil and gas properties at issue in this action to its affiliate XTO Holdings.  XTO Energy joins in this action as plaintiff because the Bureau of Land Management for the U.S. Department of the Interior (the "BLM") has not yet recognized XTO Energy's assignment to XTO Holdings. XTO Energy and XTO Holdings are unified in interest for purposes of this action and, for the sake of convenience, XTO Energy and XTO Holdings will be referred to collectively as "XTO".

5.     The United States owns or claims to own minerals within the spacing units established for various wells operated by XTO.  The United States has leased some of those minerals to XTO in exchange for consideration that includes a royalty interest in produced oil and gas attributable to the minerals owned by the United States.  XTO's obligation to pay royalties to the United States creates a "continuing security interest in and a lien on the oil or gas severed, or the proceeds of sale if the oil or gas has been sold, to the extent of [the United States'] interest until the purchase price has been paid to [the United States]." N.D.C.C. § 35-37-02; *see also* 28 U.S.C. § 2410 (authorizing interpleader naming the United States where the United States has or claims a lien on the property at issues).

6.     North Dakota owns or claims to own minerals within the spacing units of various wells operated by XTO and has leased some of those minerals to XTO in exchange for consideration that includes a royalty interest in produced oil and gas attributable to the minerals owned by North Dakota.

## JURISDICTION

7.     The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1335, which gives district courts jurisdiction over a civil action of interpleader or in the nature of interpleader.  *See also* 28 U.S.C. § 1346 (giving district courts jurisdiction over actions in which the United States is named as a defendant).

8.     XTO brings this action for interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure, which provides that "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead."

9.     XTO also brings this action pursuant to 28 U.S.C. § 2410, which allows the United States to be named as a party to an action "of interpleader or in the nature of interpleader with respect to real or personal property on which the United States has or claims a mortgage or other lien."

## VENUE

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the relevant royalty obligations are based upon the production from wells located in North Dakota.  Under 28 U.S.C. § 1391, venue is proper in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2).

## STATEMENT OF CLAIM

### I.     The Equal Footing Doctrine.

11.     North Dakota was admitted to the Union as the 39th state on November 2, 1889.

12.     By virtue of the federal constitutional principle known as the Equal Footing Doctrine, North Dakota gained title "within its borders to the beds of waters then navigable" at the time it joined the Union.  *See PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1228 (2012).

As a result, North Dakota received title to those parts of the Missouri River navigable at the time North Dakota joined the Union to the extent the Equal Footing Doctrine so provides. North Dakota's ownership extends up to the ordinary high water mark ("OHWM").[1]

13. Title to lands owned by virtue of the Equal Footing Doctrine may change over time as the waterway in question meanders and the adjacent lands erode under the waterway or accrete on the shores. *See Oklahoma v. Texas,* 260 U.S. 606, 636 (1923); *see also* 43 U.S.C. § 1301(a)(l). So where previously dry, federally-owned lands are subsequently covered by a navigable waterway through the natural forces of erosion, those lands cease to be federal and become state-owned lands. Conversely, where submerged state lands are uncovered due to the natural meander of a river and the process of accretion, title to those lands above the OHWM re-vest in the federal government. Man-made alterations to the "natural" OHWM of a navigable waterway do not affect title. *See Economy Light and Power Co. v. United States,* 256 U.S. 113 (1921) (river in "natural" state before altered by dam construction, but not afterward); *North Dakota ex. rel. Bd. of Univ. and School Lands v. Andrus,* 671 F.2d 271 (8th Cir. 1982), *rev'd on other grounds sub nom. Block v. North Dakota ex. rel. Bd. of Univ. and School Lands,* 461 U.S. 273 (1983).

## II. Leasing of Lands Underlying Lake Sakakawea.

14. In the 1950s, in anticipation of the Garrison Dam and Reservoir Project, the United States Army Corps of Engineers engaged BLM's Branch of Cadastral Engineering to

---

[1] *See Pollard's Lessee v. Hagan,* 3 How. 212 (1845) (establishing the Equal Footing Doctrine); 43 U.S.C. § 1311 *et seq.* (enshrining the Equal Footing Doctrine in legislation); *Utah v. United States*, 403 U.S. 9, 14 (1971) (applying the Equal Footing Doctrine in its current form); *see also Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co.*, 429 U.S. 363, 374 (1977) (established "the absolute title of States to the beds of the navigable waters, a title which neither a provision in the Act admitting the State to the Union nor a grant from Congress to a third party was capable of defeating," and title to the riverbed "thus acquired by the State is absolute so far as any federal principle of land titles is concerned")

conduct a survey to determine OHWM of the Missouri River and upland ownership, and the results were used to create a map of the river and its effect on land title (the "COE Survey").[2] The United States used the COE Survey to acquire lands[3] by purchase and condemnation to build the Garrison Dam on the Missouri River, and it subsequently erected the Garrison Dam and flooded areas adjacent to the Missouri River.  The erection of the Garrison Dam created Lake Sakakawea, which spans approximately 480 square miles.

15.     There are lands in the vicinity of the Missouri River that the United States has never issued letters of patents for and that have never left the ownership of the United States ("public domain lands").

16.     XTO has entered into or assumed oil and gas leases with the United States that encompass areas underlying Lake Sakakawea (the "Federal Leases"). As part of the consideration for the Federal Leases, XTO has agreed to make royalty payments to the United States for the oil and gas produced and marketed attributable to the lands covered by the Federal Leases.

17.     XTO has entered into or assumed oil and gas leases with North Dakota that encompass areas underlying Lake Sakakawea (the "State Leases"). Under the State Leases, XTO has leased from North Dakota portions of the Missouri River, to which the State claims title pursuant to the Equal Footing Doctrine.  As part of the consideration for the State Leases, XTO has agreed to make royalty payments to North Dakota for the oil and gas produced and marketed attributable to the lands covered by the State Leases.

---

[2]  *See* BLM's dismissal of North Dakota's protest of the official filing of Supplemental Plats (Mar. 23, 2016) ("ND Protest Dismissal") at p. 7. A copy of the ND Protest Dismissal is attached hereto and marked as **Exhibit 1**.
[3]  The United States generally only acquired title to the surface with fee owners retaining the right to the minerals.

### III.    Conflicting Surveys and Claims to the Missouri River and Lake Sakakawea.

18.    In 2010, North Dakota conducted a survey that it has used to define the boundaries of its claim to title in the Missouri River.

19.    In 2016, the BLM officially filed Supplemental Plats adopting the COE Survey.[4]

20.    North Dakota has asserted that its rights under the Equal Footing Doctrine cover all the submerged lands within the ordinary high-water mark of Lake Sakakawea, and not just the riverbed of the historical Missouri River. Some of the lands, including the mineral estates, that the State now claims and which it leases to XTO under the State Leases, overlap with lands, including the mineral estates, over which the United States claims ownership and which the United States has leased to XTO by virtue of the Federal Leases (the "Disputed Lands").

21.    The United States has asserted that its ownership of accretions and erosions adjacent to the Missouri River does not change until the BLM officially approves and files a cadastral survey, so the United States claims that its ownership interests as defined by an 1897 survey remained unchanged until the BLM officially approved and filed the Supplemental Plats in 2016.

### IV.    North Dakota Riverbed Legislation.

22.    On January 3, 2017, proposed legislation was introduced in 2017 Legislative Assembly as Senate Bill No. 2134 ("S.B. 2134") to address the issue of defining the OHWM of portions of the Missouri River. North Dakota Governor Doug Burgum signed S.B. 2134 into law on April 27, 2017. S.B. 2134 has been codified in the North Dakota Century Code as Chapter 61-33.1.

---

[4] North Dakota protested the BLM's adoption of the Supplemental Plats and appealed the BLM's dismissal of its protest.   *See* **Exhibit 1** (ND Protest Dismissal); *Pending Cases of January 31, 2019*, IBLA, *available at* https://www.doi.gov/sites/doi.gov/files/migrated/oha/ibla/upload/fy19-pending-cases-january.pdf (listing appeal as Docket Number IBLA 2016-0170 and identifying status as "awaiting action").

23.     N.D.C.C. ch. 61-33.1 defines the OHWM for the historical Missouri river bed channel,[5] which includes the areas underlying Lake Sakakawea that are covered by the Federal Leases and State Leases.   Under N.D.C.C. ch. 61-33.1, for the historical Missouri river bed channel generally, the COE Survey provides the "presumptive determination" of the OHWM, subject to review and adoption by the Department of Mineral Resources of the North Dakota Industrial Commission pursuant to the procedures by N.D.C.C. ch. 61-33.1. *See* N.D.C.C. § 61-33.1-03.[6] [7]   For parts of the historical Missouri riverbed channel abutting "nonpatented public domain lands" owned by the United States, a cadastral survey by the BLM provides the irrebuttable determination of the ordinary high water mark.   *See* N.D.C.C. § 61-33.1-06.   The constitutionality of S.B. 2134 has been challenged in *Paul Sorum, et al. v. The State of North Dakota, et al.*, Case No. 09-2018-CV-00089 (Cass Cnty., Jan. 10, 2018). On February 27, 2019, the *Sorum* Court issued an order for summary judgment concluding that N.D.C.C. ch. 61-33.1 is constitutional on its face, with the exception of Section 61-33.1-04(1)(b), which provides for the payment of owners based on a retroactive determination of North Dakota's title (or lack thereof). Judgment in this case has not yet been entered.

24.     Notwithstanding the enactment of S.B. 2134, the Defendants have not rescinded their competing claims to ownership of the mineral estate associated with the Disputed Lands.

---

[5]   S.B. 2134 defines the historical Missouri river bed channel as "the Missouri riverbed channel as it existed upon the closure of the Pick-Sloan Missouri basin project dams, and extends from the Garrison Dam to the southern border of sections 33 and 34, township 153 north, range 102 west which is the approximate location of river mile marker 1,565, and from the South Dakota border to river mile marker 1,303." N.D.C.C. § 61-33.1-01(2).

[6]   That final review by the Industrial Commission may be challenged in a state district court by a plaintiff that asserts an interest in land affected by a determination of the Industrial Commission. N.D.C.C. § 61-33.1-05.

[7]   S.B. 2134's definition of North Dakota's ownership of the historical Missouri riverbed channel is given retroactive effect to the closure of the dams to create Lake Sakakawea, and the OHWM determination is retroactive to wells spud on and after January 1, 2006.  S.B. 2134, Section 4.

**V.      XTO's Conflicting Royalty Obligations for Production from Disputed Lands.**

25.      Because of Defendants' reliance on competing surveys with inconsistent effective dates, and because of additional adjustments by the Defendants to the boundaries of the property of which they respectively claim ownership, XTO presently holds leases with both Defendants that purportedly cover, in part, the same lands and minerals, i.e., the Disputed Lands.

26.      XTO operates or has operated 12 wells that include the Disputed Lands within the respective spacing units.  A list of the wells for which XTO holds Federal Leases that conflict in part with one or more State Leases is attached hereto and marked as **Exhibit 2**.  A map depicting the Disputed Lands is attached hereto and marked as **Exhibit 3**.

27.      Royalty obligations accrue on a monthly basis to the owners of mineral interests it leases.  The amount of these royalty payments is based on the proceeds from the sale of oil and gas produced and severed in a given month attributable to the lessor's mineral interest.

28.      The United States and North Dakota each claim or may claim the rights to royalties from XTO, under the Federal Leases and the State Leases, respectively, for oil and gas production attributable to the Disputed Lands. Every month, a certain portion of XTO's production is subject to those competing claims for royalties.

29.      By operation of law, the United States and North Dakota both have or claim a continuing security interest in and lien on oil and gas produced by XTO, or the proceeds from the sale thereof, to the extent of their royalty interest under the Federal Leases and State Leases, respectively, until XTO makes the royalty payment owed to them. N.D.C.C. § 35-37-02(1); *see also* 28 U.S.C. § 2410 (authorizing interpleader naming the United States where the United States has or claims a lien on the property at issue).

30.      For oil and gas produced from ten of the affected wells through April 25, 2019, XTO has placed in escrow $2,714,965.82 with the Bank of North Dakota, based on North Dakota's royalty rate in the Disputed Lands.

31.     For oil and gas produced from two of the affected wells, XTO is paying royalties based on the COE Survey.

32.     The State Leases and the Federal Leases contain different royalty rates, so the amount due to the party who prevails as to ownership of the Disputed Lands will depend on the royalty rate in the applicable lease.[8]

33.     Oil and gas production is ongoing for the wells that include the Disputed Lands within their spacing unit.  Further, XTO may drill additional wells on the Disputed Lands or on lands pooled therewith.  As such, conflicting royalty claims by North Dakota and the United States will continue to increase.

34.     By reason of these conflicting claims, XTO is in great doubt as to which of the Defendants is entitled to be paid royalties related to the Disputed Lands.

35.     XTO does not in any respect collude with either of the Defendants concerning valid title to the mineral estates in dispute, nor does XTO bring this action upon the request of either of the Defendants.

36.     XTO does not assert title in the Disputed Lands in competition with North Dakota or the United States, and brings this suit merely to avoid being subject to duplicative liability for royalty obligations attributable to the Disputed Lands.

## **PRAYER FOR RELIEF**

WHEREFORE, XTO respectfully requests this Court enter judgment or orders as follows:

1)  Relieving XTO from making payments to both North Dakota and the United States on the Disputed Lands and, until the resolution of this matter, allowing XTO to pay into the Court's registry, or such other depositary as the Court may designate, an

---

[8]     **Exhibit 2** specifies the royalty rates applicable to the different leases.

amount equal to the outstanding royalty from the proceeds of production from the Disputed Lands putatively owed to either the United States or North Dakota, whichever is greater, and to make ongoing deposits into the Court's registry, or such other depositary as the Court may designate, as additional royalty payments become due and payable;

2) Requiring the Defendants to interplead and state their respective claims to royalties on the proceeds of production from the Disputed Lands;

3) Adjudicating to whom XTO is to pay royalties on the proceeds of production from the Disputed Lands;

4) Restraining each of the Defendants from instituting any action against XTO for recovery of royalty payments relating to the Disputed Lands, unless and until the Defendants' respective rights to royalties associated with production from the Disputed Lands are resolved;

5) Awarding XTO its costs, including attorney's fees, incurred in connection with the filing of this action; and

6) Granting such further and additional relief as is just and proper.

**DATED** this 29th day of April, 2019.

FREDRIKSON & BYRON, P.A.

By: */s/ Lawrence Bender*
Lawrence Bender, ND Bar #03908
Spencer D. Ptacek, NB Bar #08295
1133 College Drive, Suite 1000
Bismarck, ND  58501-1215
Telephone:  701.221.8700
lbender@fredlaw.com
sptacek@fredlaw.com

*Attorneys for Plaintiffs XTO Energy Inc.*
*and XTO Holdings, LLC*

66634083.2